IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP KIKO, | ) | CRIMINAL NO. 1:25-CR-23 |
| | ) | |
| | ) | ██████████ |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SEALED SENTENCING MEMORANDUM

COMES NOW, the defendant, Philip Kiko, and respectfully submits to this Honorable Court his sentencing memorandum.[1]  The mandatory minimum sentence in this case is fifteen years.  For the reasons set out below, Mr. Kiko respectfully requests that the Court sentence him to 15 years imprisonment, in view of his significant cognitive impairments as detailed in the attached psychological report, ████████████████, as well as his positive contributions outside of the facts of this case.  In further support of his position, Mr. Kiko offers the following:

### I.  Sentencing Guidelines and PSR

Mr. Kiko has no objections to the PSR or the sentencing guidelines

### II.  Sentencing Factors Under Section 3553(a)

████████████████████████████████

████████████████████████████████████

████████████████████████  ████████████

████████████████████████████████████

———————————————————

██████████████████████████████████████
████████████████████████████████████████
████████████████████████████  ██████████

1























### C. Avoiding Unwarranted Sentencing Disparities

#### 1. Prior Sentences with Autism as a Factor

##### a. United States v. Smith

*United States v. Smith*, 1:15 cr 42, involved a conspiracy to produce child pornography among varying online confederates, including the defendant who was one of the central figures. There were hundreds of victims in the case. The mandatory minimum in the case was therefore 15 years, and almost everyone except for Mr. Smith received a sentence above the 15 year mandatory minimum. The Court noted "I assure you, I have no qualms about concluding that this was a very serious offense. You have only to look at the sentences I have already imposed to reach that same conclusion," and concluded at the end that "I have imposed severe sentences and I live with those severe sentences. I don't advocate for them. I don't oppose them. I live with them, because I know what I've done."[4]

However, the prosecution, recognizing Mr. Smith's severe psychosocial limitations, mercifully found a mechanism to afford him a 5K reduction. Importantly, in that case, like in *Hengel*, discussed below, there was no credible legal defense and the government's mercy was exclusively in consideration of his mental health issues. At

---

[4] ECF Doc. 251 at 55.

sentencing, Judge Ellis departed and varied downward from a 30-life guideline range to an ultimate sentence of 2.5 years, primarily in view of the fact that his autism rendered him substantially different from the other 7 members of the conspiracy.  The Court noted it had "no qualms about concluding that this was a very serious offense. You have only to look at the sentences I have already imposed to reach that same conclusion."[5]  The Court noted that "I think the disparities between this and the 18 to 21-year sentences [for the other co-conspirators] is very significant but in my judgment it is warranted in this case."[6]  The Court cited U.S.S.G 5K2.0 as a means to account for the effect of autism on the defendant's culpability:

> THE COURT: Well, that's quite all right. I raise it sua sponte because it seems to me that as a factual matter, he is induced to do this in part because of his condition, autism. And the fact that the guidelines don't specifically address it, is not surprising. In fact, when Ms. Blanchard inquired, I inquired of the Bureau of Prisons: How many people do you have there with autism? Oh, we have plenty. And in fact Ms. Blanchard determined that it was fewer than a handful, is that right?
> MS. BLANCHARD: Yes, Your Honor, at this time there were two.
> THE COURT: So it's not something the law is that familiar with. But, I'm not going to depart downward if there's a valid reason not to on those facts. And I'm perfectly happy to have you instruct me whether you think 5K2.0 would work. I think you're correct about diminished mental capacity. Although, I think it's just that the guidelines people know about as much about autism as I did ten years ago or 20 years ago, which is nothing.[7]

### b.  *United States v. Hengel*

In *United States v. Hengel*, 1:19 cr 90, the government allowed the defendant to plea to a 5 year mandatory minimum, after the government and counsel discussed the defendant's autism and its relevance to his criminal conduct.  This was despite the fact

---

[5] *Id.* at 55.
[6] *Id.* at 68.
[7] *Id.* at 21.

that the government could have made out a case for the 15 year mandatory minimum of production under section 2251 or the 10 year mandatory minimum for enticement under section 2422(b). As noted by the AUSA in that case:[8]

> The first is distinguishing this case from the typical child pornography case. As this Court is aware, it has great experience in typical child pornography cases where a defendant might go online, go onto a peer-to-peer network and passively download child pornography. As horrendous of a crime that is, it doesn't involve usually direct communication with minors. This is a case where the defendant had direct communication with minors, had very sexually explicit video and word chats with minors. He sent pictures, explicit pictures of himself to minors on several occasions. And he also received child pornography directly from individuals that were believed or he believed to be minors.
>
> So there is a difference from the typical child pornography case. And the one thing I want to emphasize is that there is an enhancement in this case that is not applicable in the typical child pornography cases, which is conduct involving the sexual abuse of minors, which is a five-point enhancement. And that is given when the conduct is more akin to sort of enticement or persuasion of a minor. And so, we want to make sure that the Court understands the distinction between that typical child pornography case and the conduct in this case.

Despite this conduct which could factually warrant a 15 year mandatory minimum, the government reasonably took the defendant's mental health issues into account and allowed him to plead guilty to a 5 year mandatory minimum. And, importantly, there was no serious legal defense available in that case, but even in the absence of a serious legal defense, the government was willing to give appropriate consideration to the defendant's mental health issues.

Judge O'Grady also gave consideration to his condition:

> THE COURT: I think that Mr. Hengel is eligible for a departure under 5H for the mental health condition, notwithstanding that this is a child pornography case and also which deals with coercion.

---

[8] ECF Doc. 69 at 5.

And if he's -- if I'm wrong and he's not eligible for a departure under the 5H1.3, I believe that a variance is appropriate in the case given his mental health history, given the nature of the offense, and his real understanding of what he was doing at the time that he committed the offense – or his lack of understanding, and that a sentence under the Guidelines is not necessary. I think a sentence of a term of 60 months is the appropriate sentence in the case.[9]

### c. *United States v. Boccardo*

In *United States v. Boccardo* 1:17 cr 121, in the statement of facts, the defendant "described himself as a "pedophile" and admitted that he previously had downloaded and viewed images of child pornography involving minor boys between the ages of 12 to 14 years old. BOCCARDO also disclosed that he sometimes spends an average of two hours viewing such images, masturbating to the material three to four times."  In this case, the government offered a plea that had no mandatory minimum.   At sentencing, Judge Lee, in consideration of the defendant's autism, did not sentence the defendant to incarceration.

### d. *United States v. Fitzpatrick*

*United States v. Fitzpatrick* 1:23 cr 119 is a case involving child pornography and other offenses (though admittedly not production), and the sentencing guidelines have a low end of 188 months.  Although, the Fourth Circuit believes a sentence greater than 17 days is necessary, the possible eventual sentence in *Fitzpatrick* may suggest that a 15 year sentence in this case is more than sufficient to accomplish the goals of sentencing.

Further, in that case, the Court of Appeals referenced its decision in *United States v. Zuk*, 874 F.3d 398 (4th Cir. 2017).  The Court noted:

> Since the age of 16, Zuk had collected child pornography, favoring images depicting sadistic behavior with very young children. He traded images with others in an online community, including

---

[9] *Id.* at 15.

> photographs of his younger sister in the nude and other young
> children being anally raped. In addition, on a daily basis during a
> six-month period, he communicated online with a 16-year-old boy
> about his sexual abuse of his 5-year-old cousin, even directing the
> 16-year-old to produce specific sadistic images of the cousin's
> abuse for Zuk's own sexual gratification. By the time of his arrest,
> Zuk had accumulated more than 13,800 images of child
> pornography and 472 videos, using more than 900 email addresses
> that he created to do so. Based on this undisputed evidence, Zuk
> could easily have been convicted on the six counts in the
> indictment charging him with transmitting and receiving child
> pornography, and the sentences for those counts could have been
> stacked to reach the recommended Guidelines' sentence of 324 to
> 405 months' imprisonment, manifesting well the extreme
> seriousness of Zuk's offenses.

*United States v. Zuk*, 874 F.3d 398, 411 (4th Cir. 2017). In *Zuk*, the Court initially gave a

sentence of 26 months. On remand, he was sentenced to 71 months (less than 6 years).

5:13cr59 (KDB) (WDNC), ECF Doc. 115 (Amended Judgment). The facts of that case

are worse, involving the defendant directing the abuse of a sadistic nature of a 5 year old.

Additionally, in that case, and unlike in this case, the defendant did not attempt to seek

treatment and attempt to cease his activities prior to his arrest. In the absence of a

mandatory minimum requirement, a commensurate sentence of 71 months would be

appropriate in this case.

> ### e. *United States v. Sanders,* 1:20 CR143(TSE) (sentenced to 18 years imprisonment)

Although autistic, the defendant had a demonstrated interest in sexual violence,

which he coerced his minor victims to undergo and record. In this case, the

government's sentencing memo noted that the

> The defendant is a sexual predator with a demonstrated interest in
> bondage, torture, and rape. For years, he sought out vulnerable minors
> online and induced them to record and *send him videos of themselves*
> *engaging in sexualized, self-inflicted violence* and other sexual acts. His
> predation followed a similar pattern: he would find a minor on an online

forum or mobile application, chat with the minor, and then introduce "punishments" that required the minor to send him sadomasochistic and pornographic content. At the same time, he was amassing a collection of child pornography from the dark web and other sources depicting shocking acts of sexual violence, including videos depicting the rape of bound-and-gagged children.

ECF Doc. 604 at 1 (emphasis added). Furthermore, this defendant refused to accept responsibility: he went to trial. More so, even after his trial, the defendant displayed no shame or remorse:

Notwithstanding the severity of his crimes, the defendant has shown no contrition. Instead, he has attempted to shirk responsibility at every turn—claiming, variously, that he did not seek out child pornography (despite having it on nearly every device in his bedroom); that he is a victim who was taken advantage of (that is, by the very minors he exploited); that he was mentoring and "push[ing these minors] to be the best person they can be" (by subjecting them to his abuse); and even that he was protecting them (by exploiting them before some hypothetical offender could). While his excuses are muddled, the through-line is clear: _he lacks a scintilla of remorse_.

_Id._ (emphasis added). And this defendant also met the minor victims in person, including forcing one to undergo sexual violence. As reported in the case,

_several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals_ in his high school's parking lot. A review of his chats, on other hand, makes his true motivations clear: he sought out minors who felt confused or isolated, or ideally both, because he could more easily groom them into engaging in the kind of sadomasochistic relationships he found sexually appealing. When the minors resisted his degrading "punishments"—some of which he described as "cock and ball torture"—the defendant would respond with threats, dismissal, or self-pitying manipulation, suggesting that they failed to appreciate how difficult he had it as their "dom" or "master". And at the same time, he was seeking out videos of minors being whipped, bound, and raped.

_Id._ It is fair to say that despite the admitted seriousness of Philip's conduct, both his conduct and his mental response to his conduct pale in comparison to the violence and remorseless of this defendant.

## 2. **Prior Sentences Without Autism**

Without autism as a consideration, sentences are significant but still substantially below the guidelines.

### a. *United States v. Daniel*, **1:17CR110 (AJT) (Sentenced to 15 years, 2 months)**

In this case, the defendant met in person with the minor victim and twice had sex with that victim. He also sexually abused two other minor victims. According to the government's sentencing memorandum, "[t]he defendant has pled guilty to commercial sex with a 14-year-old child, in violation of 18 U.S.C. §§ 1591(a)(1) & (b)(2), and production of child pornography, in violation of 18 U.S.C. § 2251(a). ECF Doc. 59 at 1. The government also noted that "[i]t is beyond dispute that sex with a 14-year-old (particularly on more than one occasion) is a particularly horrible offense that deserves significant punishment. The Defendant twice took advantage of a young runaway who was desperate for money." *Id.* He sexually abused two other minor girls as well.

### b. *United States v. Friedel*, **1:14-cr-383(TSE) (Sentence of 16 years)**

This is another case in which the defendant met the minor victim in person and had sex with the minor victim. The defendant also tried to blackmail minor victims who had been recorded. The Court imposed a sentence of 192 months (16 years) in a case in which the defendant met a 15-year-old minor on the internet, caused her to send him pornographic images of herself, *and then had numerous sexual encounters with the minor (that he recorded)*; the defendant also caused four other minors to create and send child pornography, and *used those images in attempts to threaten and blackmail the minors* into engaging in further conduct.

**D. Outside of this Case, Philip has Lived a Productive Life.**

Philip's letters of support, from people who have known him for years in many contexts, describe an individual who, despite his limitations, was a truly good person.

His mother, a former federal prosecutor and judge, writes:

> He also found it very intriguing to study the Titanic. But his study was not about the ship and how or why it sank. He cared about those on the Titanic and whether they survived or not. He kept lists of everyone on the Titanic, what personal possessions they had, and whether they had families who were not on the boat. He studied that for years – had many, many lists of their effects, their family stories, and could cite names and numbers of each and every person on that ship. He cared deeply about those people.
>
> Move on to his compassion for those in World Vision. One day he came home from school (Catholic School) and there was some reference to how you could sponsor a child by sending them money and communicate with them. Every time we turned around, we had another child we were sponsoring. It was expensive but Philip was very persuasive about needing to sponsor more. But sponsoring them was not the only thing he did – he communicated personally with each and every one of them – knew them by name and all about their families. He had file folders for each child and would write to them each month personally. When he went off to teach in Costa Rica – we sent out a special printed letter to each child to let them know that Philip would be unable to write to them anymore but that he would be thinking about each and every one of them. When we moved recently from our house of 40 years to a condo, I had to discard all of those folders, and they were extensive. We did, however, keep the map he monitored which reflected with a stick pin where each child was located. I attach a picture of the map to this letter for your information.
>
> Fast forward to his last job at Dignity Memorial – where he helped grieving parents bury their children/family members. His passion and empathy came through to each of his customers. It was never about a sale for him – it was a mission to help these families have peace in burying their family members. Philip is an incredibly kind, thoughtful, and sincere man.
>
> Philip knew that he was involved in bad stuff and struggled for years with mental health issues – and I believe it was partly because of all that he was hiding. He begged an exorcist to help

rid him of the evil inside of him – and he had been working with that exorcist.

When I took my 101-year-old aunt to North Dakota to see her last remaining two siblings before she died, I took Philip with me because I knew he would be of so much help – not only helping me with my aunt but also being engaged with all three of them so they had a wonderful time together. He listened to them and heard them. He was so patient and compassionate with her and her two siblings. Philip made anyone he was with feel so loved and accepted and understood. My aunt lived only about two years later, but she always spoke about how kind and helpful Philip was through that whole trip.

I know that you have a hard decision to make but I want you to know that Philip has struggled his whole life to try to fit in and try to feel comfortable in his own skin. But insecurities and inferiority complexes made him always feel judged and out of place. He has struggled immensely in this life – but succeeded to finish college, keep being employed, got married to someone who was vision impaired, and brought three beautiful children into this world – 7, 5, and 3 – who really need him and love him completely.

Please don't judge Philip on these bad decisions; please see through all that and see him for who he really is and how even his honesty was evident from the date he was arrested and ever since.

There is no sugar coating what he did – and he is willing to accept whatever punishment is meted out; but I would like to be alive when he gets out and his children need to have a relationship with him.

Kate writes that:

Philip gave generously of his time extending kindness to those well beyond his own family to include those he did not even know, had never met, it did not matter, he deeply cared for them. While I can give many examples of Philip's kindness and generosity to others, one example that profoundly demonstrates this was his determined effort to provide burial dignity and honor to the dead whose remains had been abandoned. When Philip learned of this situation through his work at a notable Memorial Park, that there are many deceased people who are never given proper burial or entombment, he took action. When most people would have found excuses not to help, he did the opposite and reached out to me and many other co-workers, friends and family to raise funds to honor

these people, many of whom had absolutely no one taking up their cause. Philip did not even personally know the deceased, but that was not a consideration for him.

Dorreen writes:

Philip seemed to be a very kind soul and talked often of his wife and family. He also was very proud that Pleasant Valley was one of the very first cemeteries to allow people of color to be buried and he was proud that they were inclusive and had a special section for the muslim population that faced the proper direction for burial according to their practices.

I was touched by the fact that he felt badly for families that didn't have money to bury or entomb their loved ones. He felt so bad when the cemetery would find urns just dropped off at their location. He felt strongly that these souls should have a final resting place and wanted to find out a way to do a fundraiser so these souls could have a final resting place. We were going to start working on a plan to do just that before the current situation prevented us from moving forward.

He met with me first, then my husband and myself and finally my husband, myself and our adult daughter came to make the final decision. He was very helpful. In our interactions he was very patient and was not pushy and really tried to show us everything. He asked us questions to make sure that we were making decisions that we felt comfortable with and was very gracious and careful about his word choices. We witnessed him have to take a call while we were there of someone grieving and he handled it with great compassion and care. It was clear that he was kind and really cared for the people he was serving. This was the perfect job for him as you could tell he cared deeply about helping people in their grief and wanted to make sure that we were well taken care of.

His wife writes that:

After getting engaged in December, 2013, he graciously took the time for me to meet all of his friends, while at the same time wanting to meet my friends and the people who are important in my life. Once I moved here from Michigan in 2015, he embraced a new life with not only me but also my service dog Mileigh. This even included helping me give her baths periodically and assisting with cleaning out the massive amounts of dog hair left in the bathroom. He never looked down upon me for having a disability, and supported me in my quest to find not only the cause of my

condition but to seek out an official diagnosis. Once I finally received the official diagnosis of Bardet-Biedl Syndrome type 1, he took it upon himself to research the disease and reached out to a foundation for the disease so that he could understand what I was going through better.

Philip always wanted children, and was absolutely ecstatic when I got pregnant with each of our subsequent children. After finding out that our second daughter's sister was going to be a stillbirth, he grieved her loss alongside me and assisted in planning her funeral so that I would not have to bear the pain of that. During the pandemic, he helped our middle daughter get through multiple panic attacks that she had after we were first allowed to get out again. This was also the time in which our older daughter was obsessed with unicorns and he found for her birthday a place where they provided a horse dressed up as a unicorn. She was able to pretend that, for a short amount of time, that she was riding an actual unicorn thanks to her daddy. When our son was born via emergency c-section, Philip rushed off with our newborn to the NICU, at the same time wanting to make sure that I was ok as well. As our kids grew older, Philip was an incredible father. He organized play dates, set up their birthday parties, and made sure that all three kids got to their doctor appointments on time. Philip was compassionate towards our son when he had to wear a helmet for a few months to reshape his head, and by our eldest daughter's side after she broke her arm last summer.

Philip was also extremely generous with my family. Upon hearing that my grandfather was going to be turning 100 years young this year, Philip offered to pay for the festivities. Philip also sent my grandfather a beautiful canvas of a family picture that he had taken of my grandfather, father, my kids and myself that hangs in a prominent place in my grandfather's house. When my father came to visit us from Michigan, Philip would always ensure that my dad was comfortable and they would constantly argue over who (my father or Philip) would pay the bill if we went out for dinner. But Philip was also exceptional in his work at the cemetery. There were several occasions that he would return late from work after staying late to ensure that a family had been helped with grace and compassion. He took time out of vacations to ensure that his families were taken care of even though he physically was not there to do so. He even took time to speak with a man from our home, and Philip calmly, patiently and gracefully walked this particular gentleman through all of the burial options that the gentleman needed to consider and the costs associated with them.

Other letters have been included with the PSR. Dr. Deright summarizes them in observing that "[c]ollectively, these letters convey a portrait of Philip as someone with a long history of striving to contribute meaningfully to others' lives—through caregiving, faith, education, and grief support—while simultaneously coping with deep-seated emotional pain. The authors acknowledged the seriousness of his current legal circumstances but consistently expressed belief in his remorse, capacity for rehabilitation, and the value of maintaining his connection to his children, whose well-being depends significantly on his presence and support." Exhibit A at 9.

<u>Conclusion</u>

WHEREFORE, for the foregoing reasons, and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Kiko respectfully requests that this Honorable Court sentence him to a term of fifteen years imprisonment. This is more than sufficient in considering the totality of the circumstances to achieve the goals of sentencing.


Respectfully submitted,

Philip Kiko
By Counsel


Respectfully Submitted,

_____/s/_____
Cary Citronberg
421 King St. #505
Alexandria, VA 22314
cary@jc-attorney.com
Phone: 703 684 8000

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of May, 2025, I electronically provided a

copy of the foregoing to opposing counsel.

_____/s/_____
Cary Citronberg
421 King St. #505
Alexandria, VA 22314
cary@jc-attorney.com
Phone: 703 684 8000